## Case No. 9,084.

The MARIETTA TILTON v. The HARRISBURG.

[36 Leg. Int. 66.] [1]

District Court, E. D. Pennsylvania. Feb. 14, 1879.[2]

COLLISION—RULES OF EVIDENCE—CONTRADICTING WITNESS—DEPOSITION BEFORE INSPECTORS —FOR WHAT USED.

1. In a plenary cause of collision, a witness was regularly examined for the libellants. He had been previously examined on oath in an investigation before the board of inspectors of steam vessels under the authority of an act of congress. The respondents could not use his

1 [Reprinted by permission.]
2 [Reversed in 9 Fed. 169.]

deposition before the inspectors as evidence of what the witness stated in it, but could only use it for the purpose of contradicting him.

2. However the application of ordinary rules of evidence may be relaxed in a court of admiralty in proceedings which are summary and informal, there is no such relaxation in plenary causes.

In admiralty.

Henry Flanders and Curtis Tilton, for libellants.

Thomas Hart, Jr., and J. W. Coulston, for respondents.

CADWALADER, District Judge. The collision occurred in Vineyard Sound near to the Cross Rip light-ship. The case of the libellants, owners of the schooner, was that when the colliding vessels were about two miles apart, they were both approaching the light-ship upon converging courses, the schooner from the westward, and the steamer from the eastward; that from this time the schooner showed her red light on the starboard bow of the steamer, and that, throughout this distance, both vessels held their courses, without deviation, till in the peril of collision, when the schooner ported, and the steamer improperly starboarded.

The case of the respondents, owners of the steamer, was that although the respective courses were more or less easterly, and more or less westerly, they were not converging courses, that, on the contrary, each vessel showed her green light to the other vessel until just before the collision, when the schooner improperly changed her direction, attempting to cross the bow of the steamer, and thus caused the disaster.

What can have caused any danger of the collision which occurred is not easily conceivable. The night was very clear, the moon shining in her first quarter. It was not later than nine o'clock. Each vessel had the proper lights burning brightly. The deck of each was properly manned and officered. There was a sufficient look-out from each vessel; and each was actually sighted from the other at full distance. The light-ship, at her usual and known anchorage, was also in full view from each vessel. There was no extraordinary tide or wind—the actual wind being a full sail breeze for the schooner. The channel was broad. The narrowest part of it is where the light-ship lay, very near to the point of collision. Here the channel is three-quarters of a mile wide; and vessels pass in deep water, both inside and outside of the light-ship. The seeming absence of danger may, perhaps, have caused inattention where it has not been detected. The sum of the velocities of the approaching vessels was such that if an injudicious act or omission occurred on the part of either of them, there may not have been sufficient time afterwards to avert the evil consequences. There is, however, no certainty on the subject. The least improbable conjecture is, perhaps, that which may arise from the fact that, on board

of the schooner, although it was the mate's watch, and he was thus nominally officer of the deck, her captain was also on deck directing some of her movements before and at the crisis of peril. To give such orders was not beyond the legitimate power of the captain. But his simple presence on deck and occasional giving of directions did not wholly exclude or supersede the duty or authority of the mate, whose watch it was; and it is not impossible that this may have caused some fatal misconception or confusion of orders.

It is not, however, necessary to consider the case upon any such theory or hypothesis. The burden of proof is on the owners of the schooner, who are libellants, to show that the steamer was in fault. The question is, whether the libellants have relieved themselves of this burden. The course of the steamer was more or less westwardly, with a bearing towards the light-ship; and the course of the schooner more or less eastwardly, with a bearing which must sooner or later have been towards the light-ship. But independently of testimony which is irreconcilably conflicting, it is impossible to assume how far to the northward or southward of a line due east and west from the light-ship, either colliding vessel may have been at any point of time before the crisis of peril. Therefore the ingenious diagrams exhibited on the argument may define or elude the difficulties of the case, but cannot assist us in resolving them. We know, with sufficient certainty, that when the colliding vessels, having sighted each other, were still perhaps two miles or further apart, their respective courses were such that the green light on the starboard bow of each vessel was shown to the other vessel. So long as this may have continued to be the case the vessels cannot have been upon converging courses, and there was no danger to be guarded against. We also know that the course of the steamer was maintained, without any change, until the crisis of peril. This was right, unless the schooner's direction had been so changed in the meantime that her port bow, with its red light, was shown to the steamer. Just before the collision this red light of the schooner was discerned by those on board of the steamer. The wheel of the steamer was then immediately put to starboard. If the vessels had not been in very close proximity this would have been a wrong movement, because the steamer's helm should have been ported. But according to the preponderance of opinions of the nautical experts who have been examined, if the schooner's red light had not been previously shown, the putting of the steamer's wheel to starboard, at this crisis of peril, was not injudicious. If the question were doubtful, there would not have been any responsibility for an error of judgment at such a crisis.

The point to be decided therefore is whether the peril was caused by any previous fault of the steamer. It is contended for the libellants that the schooner's course had, in point of fact, been previously so determined as to show her port light to the steamer. If such were indeed the case, the vessels must have been on converging courses before the crisis of immediate peril. In that case, the steamer was in fault for not porting her helm in season, to avoid the schooner. The question of fact is thus whether the schooner's red light had been shown to the steamer before the crisis of peril? Of the schooner's company two persons only survived the disaster. Of these two, one was not upon deck, and cannot have known any thing material. The other, a seaman named Carter, has been examined. He testifies that he was on the lookout, and reported the steamer's green light to the mate, when the captain came forward. The witness, after mentioning several orders given by the captain of the schooner, deposes that when about three quarters of a mile from the light-ship, and about two miles from the steamer, the captain ordered the helmsman to keep for the light-ship, that the steamer then bore on the schooner's port-bow, and the light-ship was on the schooner's starboard bow, and that, from this time, there was no change in the course of the schooner until a minute before the collision. If this was the truth, it establishes the case of the libellants. But it is irreconcilably contradicted by previous sworn statements of the witness himself. The first of these statements was an affidavit procured and written by an agent of the respondents under such circumstances that no effect useful to the respondents ought to be attributed to it. The second sworn statement was in an investigation before the local board of inspectors of steam vessels. This was a sworn examination, authorized by act of congress, and appears to have been conducted without any exercise of improper influence. In this examination Carter states that, in his judgment, the cause of the collision was "the undecided movements of the captain of the schooner, who was very nervous and excited;" and says that, when both vessels were showing their green lights, the captain ordered the wheel of the schooner hard down (or a-port), and that, if this had not been done, the collision would certainly have been avoided.

It is contended for the respondents, that they may use this former affidavit of Carter before the inspectors as evidence of what he states in it. The argument is founded on a supposed disregard in courts of admiralty of the ordinary judicial rules of evidence. The relaxation or inapplicability of such rules, which is to a limited extent allowable in summary causes, cannot, however, be extended to plenary causes. The present is a plenary cause. Therefore the only use which the respondents can make of the former affidavit is to contradict the judicial examination of Carter. This contradictory effect is so absolute as wholly to deprive the libel-

lants of what might otherwise be the benefit of his testimony. This is the less to be regretted, because there is another extra-judicial affidavit of Carter, which we have not seen. This was an ex parte sworn statement to the proctor of the libellants. It was, under a notice to produce it, called for at the hearing, but was not exhibited. The call gave to the libellants an opportunity to exhibit it if they thought it confirmatory of his judicial examination. The court could not make an order, which was asked to compel its production. But this does not prevent an unfavorable presumption from its non-production. Such a presumption would arise in any tribunal. But the reason for the presumption is peculiarly strong in a court of admiralty, where all persons on board of colliding vessels are witnesses of necessity, rather than witnesses for the respective parties adducing them for examination.

The result is that the libellants are without any support of their case from testimony of any one who was on board of the schooner. The testimony of two persons who were on duty in the steamer is direct and explicit. Budd, who was on the look-out, sighted the schooner and reported her to the mate, whose watch it was. The mate responded. The schooner was then on the starboard bow. Budd, having reported her, was under no obligation of duty to keep her afterwards constantly in view. But there was nothing else in sight, and nothing to prevent him from doing so; and he testifies that he was watching her and her movements all the time. He certainly was in the most favorable position for discerning whatever was to be seen. He states that when she was within about three or four hundred feet off, and on the starboard bow of the steamer, she luffed, which brought her across the bow of the steamer, and caused the collision. Murphy, the mate, is a more important witness. He saw the schooner's green light before Budd reported her. She was about two miles off, on the starboard bow of the steamer. Murphy says, "the schooner kept on showing me her green light after the man reported her, for three or four minutes, . . . . when' she shut in her green light for a second or two. As she did this, I told the man at the wheel to starboard the wheel. In a second, just as he commenced to starboard his wheel, I told him steady, for she showed her green light all plain again. The schooner at this time was two and a-half to three points on our starboard bow. She kept showing her green light until she came down about four points on our starboard bow. The schooner put her helm hard a-port, and showed her red light, shutting the green light in entirely. At this time she was between forty and fifty yards off." This was just before the collision. Murphy says further: "From the time I first saw the green light of the schooner up to the time she showed the red light, just before the collision, she was never less than

two points on our starboard bow. She did not indicate at all that she was going to cross our bows until she showed her red light."

Recurring to the former part of his testimony, in which he had said that three or four minutes after the man at the wheel reported the schooner, she shut in her green light for a second or two, when the witness starboarded, and in a second steadied—he added, the vessel was then "all clear of me on the starboard bow; she showed her green light again immediately. . . . . When I starboarded and steadied, I could see the schooner; she did nothing to concern me; she did not actually port. The shutting out of her green light for an instant may have been due to the wind or her sail. It was not due to porting at that time." Here it is important to observe that when the green light was thus shut out for an instant, she did not show her red light.[3] If the red light had then been shown, it would have indicated such a changeableness, or uncertainty, in the course of the schooner as might have required the steamer to slow, or take some suitable precaution. But as the red light was not shown at all, and the green light was immediately again in full view, no change of direction was indicated, none can have occurred, and there was no occasion for any precautionary measure. If Murphy tells the truth, the steamer was not in fault. His testimony is not of a negative kind. He does not merely say that he did not see the schooner's red light, but positively deposes that her green light was fully in view until the sudden change of her direction which caused the disaster.

The man at the wheel of the steamer, named Kelly, has also been examined. His testimony is not clear. Neither is it important. The man at the wheel owes no duty to look out. He does not leave his post, and is there only to receive and execute orders of the officer of the deck; and a man at the wheel of so large a vessel would not be in a position to see much if it were his duty to look out. When he receives and executes an order, there is nothing to fix it in his recollection unless it is immediately followed by some extraordinary effect. This man remembers the order to starboard given to him at the crisis of peril; and seems to have an obscure and confused recollection of the previous order to starboard which was instantly countermanded. There was an interval certainly of some minutes between the two orders to starboard; but the witness, from indistinctness of recollection, or from the form or inverted order of questions put to him, seems to express himself without any clear discrimination between the two orders. His testimony, standing alone, might perhaps be understood as intimating that the course of the steamer had been changed when the prior

_____

[3] In one of the briefs of counsel there was a mistake on this point.

order to starboard was given, which order as is explained by Murphy, was instantly revoked, and never executed. All obscurity in this part of Kelly's testimony is however cleared up when we bear in mind that by the other evidence in the case, and by the pleadings and arguments on both sides, it is admitted, without question, that the steamer's course was not, in any wise, changed, until just before the collision, when the only starboarding, properly so called, occurred. The witness explicitly and repeatedly states that he does not remember seeing the red light of the schooner until she thus got "right close," and was apparently crossing the bow of the steamer; and he says that if the schooner had kept her previous course she would, to the best of his judgment "have gone all clear." This witness says that when he first saw the schooner, he should judge she was about two points on the starboard bow as near as he can remember. He says: "I could not tell how far off she was. I asked Mr. Murphy what is that fellow doing. I did not know exactly how the schooner was going, and that is the reason I asked Mr. Murphy. He looked through the glasses and made some remark that she was coming this way as near as I can remember." In another part of the testimony the witness says: "When I first saw the schooner and noticed her course, I could not say how far she was off; she might have been three or four hundred feet; I starboarded at that time; I mean the time when I got the order. As near as I can remember it was after I starboarded that I saw the red light of the schooner. Mr. Murphy immediately took the glasses when I called his attention to the schooner. He immediately thereafter gave me the order to starboard."

It is not easy to analyze and apply this testimony. The libellants' counsel endeavors to apply it so as to impute negligence or inattention to Murphy. But I cannot see any sufficient reason for the imputation. The question put by Kelly was not one which required an answer from the officer of the deck. It was not necessary that the officer of the deck should be all the time using his glasses. The schooner and her light could be well discerned without them. But Murphy was actually using them at the time when the schooner's green light suddenly disappeared and reappeared; and there is no reason to doubt that he was using them as constantly as was necessary. This he was doing independently of any suggestion from Kelly. On a review of Kelly's testimony, I do not think that it materially assists or injures the case of either of the litigant parties.

A fireman named Butler, who was in the steamer, has been examined for the libellants. His duty was to work below at the coal bunker. He states that he was at work below when the vessel struck, but had not gone below until the schooner was distant four or five times her length from the steam-

er, and that he had continued to see her red light for ten minutes before he thus went below. It is highly improbable, if not incredible, that any man could thus have gone quietly below to his work, when within only four or five times the schooner's length from her, because a man the most unaccustomed to the water must then have seen that immediate collision was inevitable. But the witness, in cross-examination, admits that he "had been back at work about three minutes before she struck." He afterwards says "three or four minutes;" but persists in the statement that she was only four or five lengths off and that for ten minutes he had been watching the schooner, seeing, not her green light, but "only the red light." He admits that he saw nothing while he was below. Butler's testimony, however qualified, would, if true, decide the case in favor of the libellants. He is contradicted by another fireman named Duffy. But whether contradicted or not, the testimony of Butler is of little weight. Those who are in the habit of considering the testimony of persons on shipboard, even that of persons of the nautical profession, rely very little upon impressions on the memory of witnesses who were not performing any duty connected with the subject of their evidence. Listlessness and inattention when off duty are frequent if not habitual; and this man, if he was observing the schooner at all, was more or less neglecting his own duty. It would be quite unsafe to rely upon such evidence in opposition to that of the officer of the deck. Therefore the case of the libellants would fail if it depended upon testimony of persons in the colliding vessels.

The light-ship was at her anchorage, close to the point of collision. She was "lying head to the westward, stemming the tide." If we knew, with sufficient certainty, the respective bearings upon her of the approaching steamer and schooner, we might determine at about what distance their courses first became converging. It was not a duty of any one in the light-ship to observe such courses or bearings of passing vessels. But there was nothing to prevent such observation, and there might occasionally be strong reasons to induce it. Two persons who were in the light-ship have been examined. One of them, a seaman named Barnard, testifies in a very imposing manner. But when his testimony is carefully considered, he appears to have hastily conceived crude impressions, and to have relied on them afterwards with overstrained confidence. Thus, for example, he undertook to say that from his position in the light-ship he could see on board of the steamer, and that he could see no lookout on her deck. This he said so as to imply a statement or a belief on his part that there was no lookout from the steamer. Now he cannot have had any sufficient knowledge on the subject, and the testimony of those on board of the steamer establishes most conclusively

that Budd was, from first to last, on the lookout, and remained upon the forecastle deck until he jumped down at the instant of the collision. I mention the fact here with a sole reference to the credit attributable to impressions on Barnard's mind.

In another part of his testimony, being asked what enabled him to give the bearings accurately of both the steamer and the schooner when he first saw them, and whether he looked at his compass, or made any particular observations at the time, he answered "yes;" and, being asked what induced him to look at that time, and whether doing so was any part of his business, he answered, that sometimes he went and looked at the compass to see how vessels were bearing when they were coming down, and that he took particular notice how this schooner was bearing from the light-ship before the steamer struck her. Here he does not mean to affirm that he took the bearing of either approaching vessel (not even that of the schooner) by the compass, nor was it contended in argument that he did so, and yet his language almost implied an assertion that he made either some observation by the compass, or some observation of not less precise accuracy.

This having been premised, we may consider his testimony. He was on the deck of the light-ship, and saw each of the approaching vessels. He says that when he first observed the steamer she was about a mile and a-half off, and was bearing east from the light-ship, and that when he first observed the schooner she was about half a-mile off, and bore from the light-ship about northwest by west, and that he saw no subsequent change in the course of either vessel until the collision. If all these impressions on the mind of the witness were, in every respect, precisely correct, the vessels must have been on such converging courses that the schooner's red light very soon became discernible from the steamer. In that case, the steamer ought to have ported her helm instead of continuing her course. According to the libellants' theory of the case the steamer was thus in fault. To this theory, as applied through Barnard's testimony, the libellants' diagrams mentioned in a former part of this opinion are adapted.

But the theory, so far as thus dependent upon Barnard's testimony, is refuted in a great measure, if not altogether, by that of the other witness, namely Plaskett, the captain of the light-ship. Captain Plaskett was not on deck of the light-ship at the moment of the collision. But he had been on her deck less than, or not more than, five minutes before it; and he did not go below until after he had seen the lights of both of the approaching vessels; and he testified that there was nothing in what he saw to lead him to expect a collision between them. An important part of his testimony with an intended application to Barnard's, is that vessels approaching at some distance eastward or westward of the light-ship, might change their courses "a point or two without altering their lights;" and he added that a seaman of experience could, with observation, tell from the light, the course of vessels within two points. In other words there would be no certainty, within twenty-two and a half degrees, in such impressions of the most accurate observer. This uncertainty may be considered greater as to Barnard, who was not a cautious observer, but conceived opinions hastily. It must be remembered also that both Barnard and Captain Plaskett were speaking of bearings from the light-ship, and not of the bearing of the schooner from the more distant steamer. Similar considerations are more or less applicable to the course of the steamer, which may likewise have been mistaken a point or two. This increases the uncertainty, and, in effect, doubles the measure of uncertainty.

Here it perhaps becomes important to observe moreover that Captain Plaskett says he saw the green light of the schooner, and does not mention her red light at all; but Barnard says "the schooner headed southeast when I first saw her. I saw both her lights until she got almost to us," and says that she then shut in her red light. This was almost at the instant before collision. Upon a comparison of these parts of the testimony of the two witnesses, we may conceive the probability, or possibility, that the red light of the schooner may not have been exhibited to the light-ship until after Captain Plaskett went below. If such was the case, the red light probably was not discernible from the steamer, which was farther off, until somewhat later. The last suggestions are not purely conjectural. They acquire force when we recur to the other testimony, which is inconsistent with the schooner having been, when Barnard first saw her, so far to the northward of the course of the steamer that the vessels were moving on converging lines. We do not know, with sufficient certainty, where the schooner was at any time. The course of the steamer, though perhaps less uncertain, cannot be determined with geometrical precision.

The case of the libellants, founded upon the testimony of Barnard and Butler, has been presented very plausibly and argued very forcibly. But the arguments have not convinced me that I ought to disregard the testimony of Murphy, the mate of the steamer, whose means of knowledge were the best. We should weigh testimony rather than count witnesses.

The libel must therefore be dismissed, and, I regret to say, with costs. But it is hoped that payment of them will not be exacted, as the case is one of extreme hardship.

[NOTE. An appeal was subsequently taken to the circuit court, where there was a decree for the libelants and a reference made to a com-

missioner to ascertain and report the damages. 9 Fed. 169.

[This cause was also before the courts on a libel in rem filed by the widow and daughter of Silas E. Rickards, the first officer of the schooner Marietta Tilton, for damages for his death. There was a decree in the district court in favor of libelants, and damages awarded at $5,100. Case unreported. On an appeal to the circuit court the decree of the district court was affirmed. 15 Fed. 610. It was then appealed to the supreme court, where the decree of the circuit court was reversed. 119 U. S. 199, 7 Sup. Ct. 140.]

MARINE & RIVER PHOSPHATE MIN. & MANUF'G CO. OF SOUTH CAROLINA (BRADLY v.). See Case No. 1,789.

MARINE INS. CO. (BARKER v.). See Case No. 992.

MARINE INS. CO. (CARSON v.). See Case No. 2,465.

MARINE INS. CO. (CHURCH v.). See Case No. 2,711.

MARINE INS. CO. (COLES v.). See Case No. 2,988.

MARINE INS CO. (HARPER v.). See Case No. 6,088.

MARINE INS. CO. (HODGSON v.). See Case No. 6,566.

MARINE INS. CO. (POTTER v.). See Case No. 11,332.

MARINE INS. CO. (SIMMES v.). See Case No. 12,862.

MARINE INS. CO. (STRAAS v.). See Case No. 13,518.

MARINE INS. CO. OF ALEXANDRIA (HODGSON v.). See Case No. 6,567.

MARINE INS. CO. OF ALEXANDRIA (HOWLAND v.). See Case No. 6,798.

MARINE INS. CO. OF ALEXANDRIA (YOUNG v.). See Cases Nos. 18,162–18,164.

MARINE NAT. BANK (DUTCHER v.). See Case No. 4,203.

MARINER (PHILLIPS v.). See Case No. 11,105.